s at all. Thank you so much. Good morning, Your Honors. May it please the Court, my name is Derek Adams, and I represent the Plaintiff's Appellants in this action. Plaintiff's Appellants are four licensed home care services agencies. You may hear me refer to them as LHCSAs in New York. They are located in Brooklyn and Flushing, New York, and they provide home health care services to Medicaid beneficiaries throughout New York City. There is about 600 or so of these LHCSAs in New York, some big, some small. My clients, the plaintiffs here, are the smaller type agencies. They're small by design. For example, Plaintiff Elam was founded by a Korean American and focuses on Korean immigrant communities. Plaintiff's Safe Haven focuses on immigrants from Haiti and the Caribbean. Plaintiff's Silver Lining focuses on Holocaust survivors and refugees from Eastern Europe. So they're built because there's a population of beneficiaries that aren't well served by the big agencies, and these smaller agencies form. So can you tell me what relief you think we can provide at this point, and talk about mootness or the potentiality for mootness, please? When it comes to the federal defendants, we're asking to set aside the decision under the APA based on it being arbitrary and capricious or in violation of the law. The federal defendants did not raise mootness. Cronin did not. Judge Cronin did not find that the case was moot as to the federal defendants. The state defendants, there's an issue of mootness. Can you, even though they did not, Judge Pettis and this panel has, so before you move to the state defendants, can you go ahead and address the possibility, given our interest in it, of mootness or the potentiality for mootness as to the federal defendants? So with the federal defendants, we believe it's not moot, and there's a number of remedies that the judge could fashion in this case. Let's talk about those remedies. So as a starting point, if we're correct that the statute prohibits the feds from paying money to the states that's tied to actuarially unsound rates, then that's $180 million that's gone out under this plan that should not have gone out. CMS is, there's no 11th Amendment bar. What's the remedy? The remedy could be monetary. It could be the judge fashioning, ordering CMS to fix the plan that's been distributed. There's a number of different remedies. Is it retroactively? It could be. Clawbacks? It could be clawbacks. CMS has an ongoing process with the Department of Health, as they do in other states, that they can pull back money that's been issued improperly, just like DOH could pull back money that's been issued improperly. So there's a number of ways that it could be remedied in our view. The other issue, which ties to both, since you raised mootness, in which we think Judge Cronin missed in his decision, is this is not a one-time payment that goes out and then it's never reviewed again. There's a long audit process that exists here, and the agencies that receive the money have to keep records of how they use those funds until 2028 and are subject to audit during that time frame. These funds could only be used for specific purposes. Well, but you're not arguing, I mean, there's no issue here, at least, that the larger agencies misused the money. I mean, maybe they did. That would come up in an audit. But there's no basis in this record to assume that they misused it, right? Well, there's already been $3 million clawed back, okay? And there's, my point is there's Well, but that's what I'm saying. I mean, look, the audit process that involves did they misuse the money is an entirely separate thing from whether they should never have been given the money in the first place. If they misused the money, it gets taken back. If they didn't misuse the money, or if no one has yet determined whether they misused the money, they still keep it. Your argument is they never should have gotten it, and therefore there should be a remedy that takes it back from them, even if they used it properly. Well, so I raise the audit process in the connection with mootness, because in our view, if DOH is conducting audits, these funds had to be used for specific purposes. It's likely that funds are going to be pulled back, and that causes us to have a live remedy. So that if the money, if there has been money clawed back, it shouldn't just go back into the general treasury. You're saying that money is then available for distribution to you, and therefore it is not clear that it is moot. Even worse, not just the treasury. DOH has said when they get money back, they're going to pay it to the other providers that obtain these awards. So further perpetrating the money out there that maybe was paid, but has been clawed back, and if they're going to pay it, you're saying they should have to be made to pay it back to you, not to other larger providers. Correct. And we've got another four years of that process. So my point is it's likely that there will be funds pulled back. I hear what you're saying. Now, as far as the actuarially responsible point, the government's argument is that that happens at a later stage. That is to say, they're saying there is nothing that requires that this particular directed payment be actuarially sound, that the actuarial soundness remedy or issue or requirement applies overall. Now, as you're saying, there is an audit process. There's other stuff going on. Is there anything in the record that suggests that the government has decided or should decide that the overall expenditures here, the overall calculation of the capitation payments, was not actuarially sound? So on that point, Your Honor, we disagree with the federal government's defendants and with Judge Cronin's decision that this actuarially sound process— I understand that. I understand those arguments. But you were sort of suggesting earlier on that, well, there's this process. And I'm saying, do we know anything about what is happening in that process? I'm guessing the answer is no, because this record was made before that process happened. And we filed a motion with the lower court asking for that discovery on that issue, and it was denied. So we've tried to get it. We haven't gotten it. CMS hasn't put forth any evidence related to that. But the core point on that is it's not—we're not reliant on that later process. There are a number of reasons why that's wrong, that actuarially soundness is not relevant at this first process. I'm just wondering, how would you even decide—I mean, what is it that—and I didn't find this even in your experts' opinions. How do you decide that this direction, the decision to only send this particular supplemental money, which is in addition to whatever the normal capitation calculation is, how would one even ask the question whether that is actuarially sound? Presumably, the amount of money that is being paid to the managed care organizations in connection with, you know, your clients' customers, I guess we have to assume that that was sound. That was done already. Now this is supplemental money. So how could it be not actuarially sound to give some of these people extra money? Well, so what I would say—and we're running short on time—is I would say look at the preprint itself, the 438.6 preprint. What they say, you know, it's not relevant. Table 2 is about actuarial soundness within that preprint. It's asking for cost information that would show an actuary that this is or is not actuarially sound. The other thing I would point you to is that Addendum 53, the January 8, 2021 CMS letter. The CMS letter, there's a number that we cited too, but the CMS letter— They ask questions about this, but I'm just trying to understand what your argument is as to why this isn't actuarially sound, because I'm not sure I get it. I'm not sure as to how this factors in to this kind of decision. So actuarial soundness has to be tied to the cost to provide services. Going back to the concept of managed care, it's that the state pays a payment to the MCOs, and that needs to be, in the words of the statute, projected to provide for all reasonable, appropriate, and attainable costs. And any differences in assumptions represent actual cost differences in providing covered services to the covered population. And I understand how that makes sense, because it applies to the overall how much money gets paid out. But when—and maybe I'm misunderstanding or misconstruing this particular program, but I thought this was like a bonus. You're not. That is one of the core reasons this is not actuarially sound. You cannot make a pass-through payment. You cannot, as a state, say, I'm going to go around the system and I'm going to benefit these providers retrospectively. No, you can if you satisfy certain requirements. You can if you satisfy certain requirements which are not met here. This is a—they're basing it on past payments. They're not basing it on services under the contract period. That's one of the key things that our actuary talks about, is they looked at—hit retrospective historical payments. This shows up in the January 8th letter when CMS talks about it. And they're paying it in a different contract period, the next year. That can't be done. If they're going to make a payment, it needs to be tied to the year when those services actually occur, and it needs to be connected in some way to those services. But what if Congress just says, we're going to throw some extra money at this, and one of the goals is to improve the quality of care in these home and community-based services? Isn't that already in conflict or in tension with the way the managed care thing usually works? Not if it's done on a uniform basis. So within the—the regs are all about how to maintain actuarial soundness. And within the regs, an example they gave, which is what DOH invokes here, is that it's a uniform increase provided to a class of providers. Okay, but now we get back to the classification issue. And maybe we should talk about that for a moment. Can I—if I could just jump into—it at least would help me as a general starting point. You want us to find that the class of providers here was incomprehensibly drawn. So if the world were up to you, how would we word our holding? The class here violated the regulation because what? I mean, you've already conceded in your papers that the requirements for uniformity and distributed equally don't mean every single person. So what specifically was violated here, and how would we word it? So every example that's given in— Okay, I'll let you preface it. But I am interested—I mean, you told us that the class that they defined, and they defined it, was improper. So I need you to articulate what we would say is a proper class. So what you would need to find is that the class they created was not proper. The reason it's not proper is it's not based on any sort of reasonable and identifiable group within, for example, the Medicaid state plan. No, I mean, it is reasonable and identifiable. It's a top third. It's certainly identifiable. It's whatever is the top third. So that's— When CMS says in their guidance about reasonable and identifiable, they're talking about within the state plan. The reason is it needs to be some sort of group that is in existence. Well, why do you say that? Because, for example, you say all the LCH—whatever that acronym is—need to be treated equally. But the money is actually for—I always get this confused with historically black colleges and universities. The HCBs, or whatever they are, is home and community-based. There are other community-based services that are part of that classification, which is what this money is intended for, that are not LCHW, whatever, right? So why that's different—so CDPAPs, Consumer Directed Personal Assistance Program, that's in New York. You have home health care through LHCAs. You have home health care through the CDPAP program. Those are classes of providers. Those are types of providers. If they'd given it to LHCAs, that would be a class. If they gave it to CDPAP, that would be a class. But why do you say that? You say that. But what is there that makes that sort of an automatic—that's a reasonable class, but big versus small? Suppose they said, we're going to give money to only hospitals that have certain kinds of programs available, or we're only going to give it to big ones, or we're only going to give it to university-connected research hospitals. Why aren't those just reasonable classifications if there's a reason that can be given why to give it to those and not somebody else? So to your first question, I'm not just saying it. It's in state statute. It's in Medicaid plan. It's defined as ELLICSAs. It's not broken out separately. I get it. I get it. But why—excuse me. But the question is, if the state has a reason—now, we can argue about whether the reason is a good reason or a bad reason—but if the state has a reason for saying, we're going to give it to this subcategory and not that subcategory, why do you say that, sorry, no subcategories? It has to be something that we can find somewhere in some other set of—for some other purposes, this classification is made that the ELLICSAs are defined as separate from other institutions that are in the same category that the money is being designated for. The answer to that is one word, cost. When you're creating a class within a group of providers, for example, safety net hospitals, they have different costs. From an actuary standpoint, if you're going to draw different methodologies and assumptions— It all hinges on the actuarial. It's not about the classes arbitrary in some way. It's the class that was drawn somehow is not connected to actuarial soundness. That's the heart of your argument. It's both, Your Honor. It's the actuarial points, they are part of this entire regulation. I'm sorry. What other than your actuarial soundness argument, why other than that is it unreasonable to say, here's why we're giving it to the larger institutions because the small ones are going to get so little money that there's nothing meaningful they can do with it? That's what they say. That may be right or that may be wrong, but why is that somehow inherently an unreasonable classification other than, as you've just said, that it doesn't go to the actuarial soundness? The regulation itself, it starts out by talking about a uniform dollar percentage increase for network providers that provide a particular service under the contract. Judge Cronin found that what was done here was uniform because $3.80 went to these providers. Because there is a classification. But it's all tied to that issue, right? It's all tied to actuarial soundness, then. Not just that, but also the second piece of the regulation talking about a class of providers, you can't read out the first part, which are the uniform dollar percentage increase. What's the point of it having to be uniform if the state's free to pick these two providers over these two? Well, suppose, for example, you have a classification that says the money can only go to hospitals that are affiliated with Ivy League universities. Now, in New York City, that would mean, while Cornell and New York Presbyterian, which is affiliated with Columbia, get it, NYU Langone does not. That might seem to be unreasonable. If they said, we're only giving it to hospitals that are affiliated with university research centers, and the reason is because we want the money to be used to research effective outcomes with Medicaid patients, that sounds to me to be reasonable, even though the category of hospitals is being subdivided. Well, but that would be under a different part of this reg, which is the value-based or performance-based. What you're talking about, they can come up with a performance-based initiative and say, here's a pot of money. If you guys can prove you did it, you get the money. That's not what happened here. It's under the uniform approach that has to be for a class of providers. If there's a distinction, an existing distinction, that they can point to. Why does it have to be an existing distinction? Why can't they make one up if it's reasonable? If they have a reason for saying, we're going to classify this rather than that? It's not that they can't make one up if there's a reason, but that reason has to be connected in some way to the cost to provide services. Or to the value you just said, right? So that's a different issue. That's value-based. If you achieve something, that's again, looking forward. Well, what if you are? Their argument is, we're doing this on a looking-forward basis because we think that giving this money to the larger institutions means they will be able to do something meaningful with that money, whereas if we spread this money across everybody, the people at the low end would only get like $100 or $1,000, and it's not going to be meaningful in improving the quality of care. So is that crazy? That's not what they're doing, because they're basing this payment on a retrospective data, old data that's in a different contract period, and they're just giving them the money. If you think it is reasonable to distinguish between the big ones and the small ones, how would you decide how big somebody is going to be next year, rather than based on what you've already got? It's projected. Actuarial costs are projected. Yes, exactly. And they're projecting these costs. But they're not projecting these costs based on any sort of retrospective differentiation between our clients and big LHCAs. In New York, the way the actuaries do it is there's four rate cells. You have New York City, you have three other regions in the state, and every LHCA is treated the same. That's how their actuaries do it. This departs from that by not treating all LHCAs the same, which would be the existing class, but picking out the winners and losers. That's what CMS says you can't do. You can't benefit specific providers at the sake of providers providing this under the contract. With a safety net hospital example, that's an exception to the rule because of the cost to operate, but that's not what we have here. Can I ask if you think that our deference applies at all in this scenario? The Kaiser hour deference, in our view, would, if at all, apply to the formed decisions that CMS has put out on this issue. So we're pointing to, this is a unique case where we're pointing to CMS's own language on this time and time again. If there's any deference, it's on their formed policy decisions. It's not based on, as Kaiser says, a convenient litigation position. It's not based on this ad hoc position now. It's based on the full record of all the subregulatory guidance CMS has put out on this is supportive of our decision. What about their definition of what is consistent with the board's class of providers? Does that get any deference? In our view, the subregulatory guidance, as well as the regulations and the proposed rules, are supportive with what we're saying. Well, what about the specific guidance, and this is the main one the government hangs its hat on, that says, we have been traditionally deferential to what the state programs do if they are uniform within a reasonable and identifiable class. How does that help you? And the examples within that very guidance. No, it says those were given as examples, though. They are, your honor. You're right, they're examples. But every example given is a type of provider or a group of providers. It's not, we're going to take home health care and we're going to cut it by revenue. It's not, we're going to take hospitals and cut it by revenue. All of these examples, and yes, they're examples, but CMS has never said. But some of them do cut what are otherwise categories of care, right? Federally qualified health centers and safety net hospitals. Those are the two. Yeah, well, so how are they, why are they separated? Because of the cost. That's why. It costs more to run a safety net hospital, so therefore they're treated differently in the rates that an actuary comes up with. It costs more to operate them, so there's more funding given to them. That's what makes them distinct. It's an existing, there's an actuarial difference. Here, there is none. Again, it comes back to actuarial soundness, then. You can't avoid actuarial soundness because it is part of these entire regulations. So when you're looking at what would be- I'm not trying to avoid it. I'm trying to say that's what your argument is ultimately based on, is this can't be a classification because it's not actuarially sound. In other words, the way that I would think about it, and you can tell me if you disagree with how I'm at least imagining your argument, is that nothing would be reasonable if it were not actuarially sound in terms of coming up with a reasonable and identifiable class of providers. Well, that is true. But that's your argument. That is the first part of this process for approval. Before you even get to the class of providers, it has to be actuarially sound. It has to follow the actuarial regulations at 438.4 to get there. So you would be asking us to say, per se, as a matter of law, that any class of providers that was not actuarially sound would be not reasonable? It would not pass the test for process for approval. So CMS, in our view, is not permitted to approve a class that is not actuarially sound. That's the starting point of 438.6c2 within that. So that is like the preface to everything here. So yes, it provides color when you're looking at what would be a reasonable class. It would need to be something that's actuarially sound. Counsel, speaking of that reg, is it correct that it has been amended since this all started percolating and now that it expressly says it must be actuarially sound? Yeah. And if so, how does that affect our analysis? If there was any doubt that CMS meant for actuarial soundness to be required as part of the process for approval, there is no longer any doubt because that is now The current version, but that's not the version that was in effect at the time this decision was made. Yes, that is now specifically under the categories, not just process for approval, but written. The list of things we need to achieve. Yes. I think that further supports us because it shows if what CMS was claiming in this case was right, the regulation wouldn't have moved further in our direction. It shows that they know how to write one that has the effect that you want, if that's what they want to do. If experience has shown that that's the way they should do it, now they've made that clear. But does this say, is there anything in that regulation that says this is what we always meant and this is the way it should always have been? As opposed to this is the way it shall be going forward? What is in the reg is that it's already under process for approval. We're not pulling out some random statement in the reg and saying, hey, look over here. This is the beginning of process for approval. This is what CMS says, hey, state, if you want my approval, this is number one, process for approval. You've got to develop. It must be developed in accordance with actuarial soundness, principles, and rules. And within the preprint itself, CMS asked for that. But it's not actually because the actuarial, the compliance with all the other regulations is separate. Then separately after that, you get a section B that lists the things that are necessary for preapproval, which is different. I mean, it says we're not going to do this unless actuarial soundness and B, unless you comply with the following for preapproval process. And actuarial soundness, the way they amended it was to move actuarial soundness down into the section about preapproval. Well, it's not preapproval. Let me be clear on that. This whole regulation is about this preapproval process. So that existing little I is still part of the preapproval process. And the preapproval, which ties to the preprint, the 438.6 preprint, it already is asking for information about actuarial soundness from the state. It would make little sense if CMS asked for all this information and within their guidance consistently say, we need this information, if they did not have to perform any review of actuarial soundness in order to approve a preprint process. OK. Thank you. We will hear from you on rebuttal. Thank you, Your Honor. Ms. Cornish? Am I pronouncing your name correctly? Yes, Your Honor. Cornish. Can you start off with mootness, please? Sorry, what was that? Mootness, please. Oh, sure. So as Your Honor is aware, we have not argued that this case is moot. Although we haven't really heard convincingly from plaintiff's counsel until now what remedies might be available, it is true that in the normal course, as we've described in our briefing, there is a preprint approval, the state directed payment approval, and then a separate actuarial soundness analysis of the contract rates as a whole. And it is also true, and this was in the preliminary hearing record, at Joint Appendix 132 to 33, sometimes there's a reconciliation if at the second larger actuarial soundness analysis there's an issue. So that type of reconciliation is theoretically possible. However, what that exactly would look like here, I'm not sure. Also, although it's not in the record, it is worth noting that CMS has completed the review of the rates for this contract period. That was in July of 2024. So not only has the state directed payment review been completed, and that's of course what's at issue here, but at this point, the larger actuarial soundness review of the capitation rates has also been completed. Has been completed? Yes. Uh-huh. And do we know how it came out? Is that part of the record here? The contract rates have now been approved. It's not in the record. For that year? For that, yes. For that state fiscal year. The relevant period. Okay. Could I just get back to the mootness? There's a difference between saying we didn't argue mootness, which we know, but of course mootness is jurisdictional and therefore we are required to inquire into it. So there's a difference between saying we didn't argue it and saying it is our position that it is not moot. You could say our position is that it is not moot. Our position is, well, now that you mentioned it, it is moot. Or our position is we don't have a position on whether it's moot. So A, B, or C? At this point, we don't have a position on whether it's moot. And again- Okay. So you're not in a position to help us either way by making an argument that most emphatically this is in fact moot or saying, well, we respectfully disagree with our state colleagues. We think it's not moot. The federal government has no position on mootness. That's right, Your Honor. Okay. So can you talk to us about how one would limit the permissible definition of class so it doesn't completely swallow the equality requirement? I mean, I'm hoping that you'll concede there are some limits. So the limit is what's been articulated in guidance already by the agency, which is that it has to be reasonable and identifiable. And the agency here determines that- So how do we define reasonable? It says it's actuarial soundness. What do you say? It's certainly not actuarial soundness. Okay. It's not what he says. What is it? I'm going to talk more about actuarial soundness in a minute. But the agency in effect considers whether the state-directed payment proposed by the state is going to advance the Medicaid objectives of the state and of the federal government. And it's clear from the record here that it does. Okay. So whether it advances the purposes of the federal government. Let's hold it at that for a moment. I take it it would be unreasonable if the classification wound up being some arcane series of criteria that resulted in only the one that was operated by the brother-in-law of the managed care organization or the brother-in-law of the state Medicaid agency gets the money. That would be unreasonable. Depending on the full circumstances of the rationale, it might be. I think one of the benefits of this is that- In other words, we're trying to avoid corruption here for one purpose. And anything that looks like corruption might be unreasonable. You'd agree with that, right? I think that is the purpose of having these guardrails. Yeah. And so the question is, I guess the way you're formulating it is, does the purpose for which the classification was made comport with the purposes underlying the program in question? That's right. And your argument for why it does comply or why it was reasonable for CMS to say it complies has to do with the reasonableness of the argument by the state that large providers could make use of this money to improve quality because they would get large grants and reducing how much they get in order to give a few pennies to the smaller agencies would not serve those purposes. That's what they gave as their reason, right? In short, yes. And why is that reasonable? Well, that's reasonable because they had an amount of funding, and they wanted to be able to implement certain programs. And if they had the class defined as broadly as plaintiffs would have liked, the money would not have been able to be used meaningfully by many of the LICSAs. Does this have to be right? You're assuming that there's some sort of economy of scale, right? And it's a very conclusory assumption that the bigger you are, the more money you have, you're going to be able to provide better services, you're going to be able to use it better. Are we expected at this stage to just accept that conclusory idea? Well, it's not a conclusory idea, and I would also push back a little on the idea that that was the state's rationale. Okay. So, well, we need them both, right? So, I mean, one of the things we're trying to do is figure out what was reasonable, whether or not it comports. Judge Lynch asked you what were the reasons that they gave. You articulated them. And I'm saying how do we know that they're right? Well, the state – I mean, and do they have a burden to show that they're right at this stage, or do we just accept whatever conclusory statement they said as their reason? Well, when the state has told CMS in the preprint that it conducted a data analysis and that it found what it found with respect to the amount of money that would be going to a full class versus the class as it was defined in the preprint, CMS understood the state's rationale. I don't think there's any requirement that it actually look at the underlying data for that specifically. What's required here is that CMS understands the state's reasoning. And remember that the state-directed payments are by design supposed to give states flexibility to address needs in their money. I'm sorry to be pushing, and I hope you don't – we're going to have to put something that exists on a piece of paper that is going to need to live beyond just this case. So I'm interested in hearing from you what you think is an appropriate way of determining reasonable. And what I am hearing was they gave an answer that sounds reasonable. And I guess my question would be is do we write on our piece of paper that if somebody offers a very simple sentence that sounds reasonable, that's enough because we have to give them our deference or something or that there's something behind it. He's saying that he needed – that he actually wants something harder than that, that we need something like actuarial soundness and that we need to look at experts. That's his view. What is – what are you telling us is what we put on our piece of paper for how this needs to be interpreted and what is defined as reasonable? So I think the question is fundamentally did the state provide a reasonable justification where these services actually cover the requirements of the contract and promote the objectives of the Medicaid program. And the best analyst of that is the agency that administers this complex program, which is CMS. And that's why CMS has said even though the class language in the regulation is fairly broad, it says it's actually going to look to see whether the class is reasonable. And it does – And you're saying if they provide a plausible reason for why this would serve the objectives of the program and CMS accepts it, we should defer to that. Is that a fair statement of the standard? Yes, Your Honor. Okay. Now is that the standard that Judge Cronin applied? Because I think it isn't. And I think you in your brief support what he said, which is that the dictionary of a class means something like anything that has common characteristics, and that would be just about anything. That would mean there's – that he didn't say it has to be a reasonable classification, as you just said, that furthers the objectives of the government's program. He said a class is any group of objects having common characteristics. So if they said only the ones with green doorways, that would be ones with common characteristics. But I take it you would agree that that does not actually comport with what you just said is the definition of reasonable. So that might arguably meet the actual language of the regulation, which is quite broad. But as this Court is aware and as Plaintiff's Counsel has acknowledged, in subregulatory guidance, the agency has said that it looks to whether a class is reasonable and identifiable, and it defers to states again because deference to states is an integral part of the Medicaid program. Okay. So my question is, to start with, suppose we thought that Judge Cronin did not apply that standard. Do we have to remand to the district court to apply that standard, or is the standard that you are now proposing such that the record is sufficiently capacious that we could conclude that the reasonable and identifiable standard is met? The requirement is that the state-directed payment meet the regulatory requirement for class of providers, and that is what Judge Cronin said, and that was met here. As you say, that's quite broad. What the agency again has said in subregulatory guidance is it's a little more than that. It needs to be reasonable and identifiable, and the proposed state-directed payment here met that criteria. The agency determined that it's reasonable. So there would be no need for remand for further consideration because it is really the same standard. And I'm interested in one other thing that you said. You said that in response to the queries, right, when they first submitted this, CMS said, wait a minute, we want to look into this and ask a bunch of questions, and I think you said that they provided some data. Is that correct in response to the queries? So the state didn't provide the underlying data, but it provided an explanation for how the class was determined. I see. And this is in response. This was both in the actual preprint and in response to questions that CMS addressed to the state. So, for example, in the joint appendix at 401, there's a discussion about how there are many LHCAs that have de minimis Medicaid service delivery hours, and so funding all of them, the state determined, would result in a receipt by hundreds of providers of less than $1,000. So that type of representation informed the state's analysis and CMS's analysis. I see. So that is basically what you are relying on to say that what was provided gave CMS a reasonable basis to say this was a reasonable classification. Yes, sir.  Let me, you know, all of this, I think the questions so far from a few of us have been premised on the classification notion, and I want to give you a chance to address what I think was Mr. Adams' principal point, which is all of this, the only classifications that are reasonable are ones that are actuarially sound, and that actuarial soundness is the underlying requirement that any of these decisions have to be based on. So tell us why that's wrong. So that's absolutely not correct, and one critically important reason that's not correct is that by definition actuarial soundness only applies to the capitation rate as a whole. It only applies to the full contract rate. And so there is a definition in the regulations at 42 CFR 438.4 of actuarial soundness, but it's a definition of actuarially sound capitation rates. And what the regulation at section 438.62 talks about essentially is there will be a preliminary state-directed payment analysis, and that's what's been challenged here. And then subsequently incorporated into the annual contract rate review, there is an actuarial soundness analysis of the contract rates as a whole. So the question about actuarial soundness goes to the capitation rate as a whole, and the way this particular directed payment factors into that is if it turns out that this particular directed payment screws up somehow the capitation rate in such a way that it is not actuarially sound, then we've got a problem, but we don't determine that at the preapproval process. That's correct. And the preapproval process is in section 438.6. I think I've got this right, but it's always hard to get the outlines straight. C2. And within C2, there's little Roman 1 that says all of these payments have to meet the requirements spelled out in 438.4, which includes actuarial soundness. That's little Roman 1. And then in little Roman 2, it says that contract arrangements that are supposed to be approved or appropriate directed payments have to meet the following requirements. And then there's A through F. And actuarial soundness is not explicitly in that list. It's only in little Roman 1, which is separate. Do I have your argument correct? Is that what it is? That is absolutely correct, Your Honor. Okay. And then what is wrong with Mr. Adams' argument that A through F are all basically about actuarial soundness? Can you explain to me why they're not, if they are not? I'm not even sure what it means to say they're all about actuarial soundness. Actuarial soundness is a somewhat complicated concept, but the idea of it is that the contract rate as a whole is going to provide for reasonable, appropriate, and attainable costs that are required under the corresponding contract for the rating period. So what the agency has done is set forth specific requirements, and these are guardrails, and then also said that once there's a state-directed payment and it's been approved, that gets incorporated into the annual rate review. But I would also point out that even though all the regulation requires is satisfaction of the C2, Romanette 2 factors, there was assurance of actuarial soundness that CMS requested and received, and it's in the record here. So, for example, in the final preprint, the state actually makes an assurance that the state-directed payment was developed in accordance with 42 CFR 438.4 and the standards specified in 42 CFR 438.5 and generally accepted actuarial principles and practices. That's in the joint appendix of 391. But also, and this was in the preliminary injunction hearing testimony, the Office of the Actuary actually participates as a federal reviewer in the preprint review process, and so if there are any obvious red flags, there is someone from the CMS Office of the Actuary who is involved in the process and practice, and that's in the joint appendix at page 96. So are you telling me that C little Roman 1, which is the hook for getting actuarial soundness into this argument, is satisfied by the state's assurance and the fact that CMS has their own actuaries take a look at this, and that's all we need to know. And then in little Roman 2, you have a variety of these requirements that have, it seems to me, nothing much to do with actuarial soundness, like that the payment expects to advance at least one of the goals and objectives in the quality strategy, where that the state has an evaluation plan to measure whether it actually does advance that strategy and does not involve intergovernmental transfer agreements, whatever that means, and may not be renewed automatically, which means what it says, I guess, which is a specific requirement, which may help with actuarial soundness or may not. But, I mean, is that kind of what you're saying, is that the preapproval process asks for A through F, and one is just a generalized thing that is satisfied in the way that I just argued? Is that the argument? I'm just trying to get this, you know, clear. Well, the way I would phrase it is that what the regulation actually requires CMS to look at and requires the state to demonstrate at the state-directed payment stage is what's in Romanette 2, so A through F. The state is also required to develop the state-directed payments in accordance with the standards at Romanette 1, but CMS is not required to actually conduct an actuarial soundness review at the preapproval stage. But it will come back to bite them if it turns out that there's a problem with actuarial soundness at the stage of the later overall review of the capitation rate. Right. That's correct. But, again, the agency went above and beyond what's required here by also asking the state to make an assurance in the preprint that the state-directed payment was developed in accordance with these standards and by having someone at the office of the actuary. And my last question is Judge Merriam's earlier question, which is what do we do with the fact that after all this brouhaha, the agency rewrote this regulation and moved what is now in Little Roman 1 and made it sub-G or something like that of Little Roman 2? In other words, that today some kind of inquiry into actuarial soundness or into at least in general whether the plan was developed in accordance with Section 438.4's requirements is now baked into the preapproval process in a way that it was not explicitly done before. What meaning does that have in our inquiry? I don't think anything in the new regulation or in the language when the rule was promulgated, the new rule, should impact how the regulation that was in effect at the time of the state-directed payments approval is viewed. I thought you were going to say the negative inference was that it didn't do it beforehand. I'm actually surprised to hear you say that it doesn't impact anything because that would be his argument, right, that it was always there and now they're just clarifying it. Is that the position you're standing by? Perhaps I said that inartfully. What I mean to say is there shouldn't be any suggestion from how the rule is written now that Roman 1 was a requirement back in 2021 and 2022. Can I just do one last question then? So back to your definition of meeting a goal of Medicaid, does the idea of a class of providers, does the commonality have to do with how they provide services or who they serve? I don't think it necessarily needs to be one or the other. The class of providers can be, for example, rural providers or safety net hospitals. So it doesn't have to be defined in that way. So you think enough work to not swallow up or to eviscerate the equally distributed one is, again, getting done by the reasonable and identifiable portion or the reg? Right. So I think that the idea of making uniform payments within the class and the idea of a class definition clearly work together. So there is an idea that you have a class, the class is reasonable, and then payments within that class. One way you can measure the class is, for example, whether it expects to advance at least one of the goals and objectives of the government. I mean, if it's a classification that might make sense for another purpose, like whether it has a green door, which might make it more visible in the community compared to something else, that might be a reasonable classification for something, but it wouldn't be a reasonable classification for purposes of a directed payment because it would be hard to explain why that advances one of the goals of the program. That's right. And it's also worth noting that in the preprint here, the state described the types of programs and services that the LHCSAs were going to be required to provide through this funding. And so, for example, the LHCSAs could use this money for things like workforce retention strategies, developing training programs, building appropriate TP stockpiles. So, again, the state explained how it was trying to direct funding to do the most good in this area. OK. I just don't want Ms. Greenwald to think we forgot. If you don't mind starting with mootness as well. Of course, Your Honor. So I first just want to clarify that our mootness argument is specific to the state defendants. So we have not argued that the case is moot as to the federal defendants. So I don't think our positions are inconsistent in any way, regardless of what a position they may take on mootness previously or now. So as to mootness, we disagree with the district court's analysis only insofar as the district court thought that the voluntary cessation doctrine should apply here. That doctrine should apply when a defendant voluntarily complies with a plaintiff's demands in order to moot a case and can freely restart that conduct at any time. That is not what occurred here. The state defendants were not voluntarily complying with plaintiff's demands. In fact, they dispersed all the money, despite plaintiff's demands, to enjoin that conduct. And they did it not to moot the case, but to comply with the federal statutory deadline in order to claim the increased funds. Nor could they just voluntarily restart this conduct at any time. They would have to go through the rather involved process of submitting a new application and getting CMS approval and so forth in order to do this again under the same terms. I'd also just like to tell the court... I'm sorry, so she said they don't take a position on mootness. What are you saying? I'm saying that the claims against the state defendants are moot. And that is because the recoupment? What happens about the recoupment argument? Right. So I think it's fairly undisputed that the claim to enjoin the 2022 payment is moot because they have gone out. As to the suggestion of an audit, I'd like to clarify a few things. The State Department of Health is not currently conducting any audit of LHCSAs, and there's no plan to specifically do so. In addition, even if the State Department of Health suddenly undertook an audit of one of these LHCSAs, and even if the State Department of Health noticed a problem with these specific funds regarding one of the LHCSAs that got money, and even if DOH determined that recoupment was the appropriate and, as a practical matter, possible to get that money back, there still has not been demonstrated any reasonable expectation that that money would be provided to the subset of LHCSAs that got the money here that the plaintiff LHCSA has challenged now. This long chain of speculative assumption shows how this purported prospective relief is entirely speculative and cannot support a live case or controversy. But more importantly, this also goes to the ex parte Young analysis, which we think the District Court got exactly right. That was the same exact analysis the District Court went through to explain that there's no ongoing federal violation and nothing but speculative conjecture as to the potential for another violation of federal law. Let me try and see whether I understand this by trying to simplify it. It's basically what you're saying that whether or not the case is entirely moot, you take no position on it. That's got to do with any relief they might be seeking from the feds. As to the State, however, what the State did was it made its application in due form, said, this is what we want to do with the money, CMS approved it, and you spent that money out, and it's gone. It's all done. You don't have any role anymore in dispensing it. It's never going to happen again, maybe, because this was sort of a one-shot program? It was. This is not in the record, but the State Department of Health, this is the only State-directed payment that it has made to LHCSAs, so this is not something that the State expects to do. And this particular payment is in connection with a specific supplemental appropriation that was only in that one year. Is that correct? That's correct, Your Honor. So there's nothing for you to do anymore. You've done it, and there is no possibility, there is a speculative possibility that a similar program could be enacted again. And if it were, you might do whatever you might do in that situation, but that's all speculation about the future. There's nothing on the boards to do it. That's exactly right. And if I could just make one very quick point, which is that as to the State defendants, the Court can also just resolve this entirely by noting that the case against the State defendants has been waived on appeal. That is something the Court can do without even addressing mootness. Because they didn't specifically make an argument about mootness vis-a-vis you in their briefs. They made no argument about us at all in their opening brief. And I suppose another, let me see what you think about this. Suppose we first resolved the case against the feds and resolved it on the merits. Wouldn't that also moot the case against you? Because if their approval was correct on the merits, then there's nothing left to fight about between you and the plaintiffs. Yet there are many ways to resolve this case in our favor. The Court may do so as it wishes from our perspective. But there's no jurisdictional reason why we need to start with the question of mootness as to the State defendants. If we don't determine that the case is, if we determine the case is not moot against the federal defendants and proceed to the merits, and they win, the case is over. That's correct, Your Honor. Okay. And we don't necessarily need to address the question that had they lost, you would, the case would still be moot against you. You do not need to take that extra step. Or waived against you. That's correct. The Court does not need to take that extra step. If, on the other hand, Mr. Adams prevails with respect to the federal defendants, then you would say that you still can and should win on the grounds of mootness and waiver as to any remedy that would be applicable to the State officials. Correct. Okay. Thank you. There's a pending suit in State court, right? That's correct, Your Honor. And does that change how we should approach any of this? No, that's a separate claim. It's a claim under State law. If the Court has no further questions, we urge the Court to affirm the dismissal of the State defendants. Thank you. Mr. Adams, we'll let you go. We'll let everybody go a bit over, so I'm going to be a little more strict this time. Okay. Well, I'll keep it short and make two points. The first on the actuarial soundness point. The federal defendants argued that it's not relevant at the point of the review of the preprint. The regulation, if you look at 438.6C2i, it says all contract state must develop it this way. It doesn't say we need to evaluate at the preapproval stage whether they have done so. Because that's all in Little Roman II. In Little Roman I, that says what the state is supposed to do. And I took the government to be arguing that so long as they say they did and we have our actuary check it out and doesn't say there are screaming red flags here, that's all it takes. So I'll point, in this case, I continuously point to CMS's own language. From the January 2021 letter, they say CMS has required states to demonstrate that the state-directed payments result in provider payment rates that are reasonable, appropriate and attainable, that's the actuary soundness language, as part of the review of the preprint. CMS itself says that. This is part of the preprint. And the information within the preprint in this case, if you look at it, it's not even specific to the class created here. Before I run out of time, to your point, Your Honor, about this being conclusory, this money can be used to increase the pay for the home care workers. They get paid say $20, $21 an hour. And these LICs can use this funding to pay them $22, $23. That's what it can be used for and that's what my clients didn't get the opportunity to do. And it was conclusory. And in the testimony in the lower court, the Medicaid director, when I asked him about this during his testimony, he said, well, I think bigger agencies provide better quality. And I asked him, what is your basis for that? He says, well, if you do more of something, then you're better at it. That was the justification by DOH for this. And I take it that one part of your argument is if the goal is to improve quality and one way of improving quality is to give everybody a $1, the actual people, that would work proportionately no matter whether you're big or small. Because you could give, if you only have two workers and you get enough money, only a few thousand dollars, that would be enough to raise their pay by the same amount that the larger agencies getting a bigger block amount of money would have to pay $1 an hour more. There's no real reason why the bigger agencies are in a better position than you are. Absolutely. And that's what ARPA was about. It was about rewarding these employees for making it through COVID-19. And my clients' employees are the ones that were disadvantaged because they don't get any sort of increase in their rates because of this creation of DOH. Thank you. We'll take the case under advisement. Thank you, Your Honor.